IN THE UNITED STATES DISTRCT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CITY OF LEAVENWORTH, KANSAS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CORECIVIC, INC., | ) | **Case No. 5:25-cv-4032** |
| | ) | |
| **Defendant**. | ) | |
| | ) | |
| Serve at: | ) | |
| CT Corporation System | ) | |
| 112 SW 7th Street, Suite 3C | ) | |
| Topeka, KS 66603 | ) | |

## COMPLAINT

*The only way I could describe it frankly, what's going on at CoreCivic right now is it's an absolute hell hole. The Court is aware of it. The defense bar is aware of it. The prosecutors are aware of it. The United States Marshals are aware of it. He's doing his best to get people moved as soon as the United States Marshal Service nationally can negotiate contracts with other facilities.*

*So that's no news to me as well, all that's going on there and causing trauma to everybody – guards are being traumatized. Guards have been almost killed. Detainees are being traumatized with assaults and batteries, and not long ago a detainee was killed. So I'm well aware of the situation at CoreCivic and very troubled by it as well.*

United States District Court Judge Julie A. Robinson, *United States v. Mathew Clark,* Case

No. 16-cr-20078-JAR, Doc. 87, pp. 46-47 (Transcript of Resentencing, Sept. 8, 2021).

## I.    INTRODUCTION

1.    The foremost responsibility of the Leavenworth City Commission, the City's

governing body, is to protect the health, safety, and economic development of its citizens and

businesses and to preserve and protect property values throughout the City. To help achieve these

objectives, the City has enacted Development Regulations governing the use of land and buildings.

These Development Regulations include provisions first enacted by a 2012 ordinance prohibiting

the operation of a jail or prison without having a special use permit ("SUP") issued by the City. Through an SUP, the City can impose conditions on the use of land to prevent or mitigate harm, economic and otherwise, to the City and its citizens arising from the manner in which land is used, including harm caused by some of the conditions described above by Judge Robinson.

2.      This case is not, however, about what conditions the City may place on CoreCivic's use of its property. Rather, it is about whether CoreCivic may use its property for a jail or prison within the City without first obtaining from the City a special use permit, as required by the City's Development Regulations.

3.      CoreCivic is a private for-profit corporation that operates prisons and jails throughout the United States. From 1992 through 2021, it owned and operated a "detention facility" at 100 Highway Terrace ("the Property"), located within the boundaries of the City, known as the Leavenworth Detention Center ("the Facility"). The Facility primarily housed pre-trial detainees under a contract with the United States Marshals Service.

4.      During this time, CoreCivic became embroiled in multiple widely publicized scandals resulting from its gross mismanagement of the Facility and the ensuing rampant abuse, violence, and violations of the constitutional rights of its detainees and staff, such as those described above by Judge Robinson. CoreCivic's mismanagement directly and indirectly impacted the City in countless ways, including for example, by imposing unexpected maintenance costs on its taxpayers, unreasonably increasing the burden on the City's police and law enforcement agencies to address violent crime, and even *impeding* the City's investigation of sexual assaults and other violent crimes against detainees and staff.

5.      Because CoreCivic was already using its Property for a jail or prison when the 2012 ordinance went into effect, the City's Development Regulations "grandfathered" that use—that is,

until CoreCivic abandoned that use for over three years. In CoreCivic's own words, the Facility is "inactive." Under the City's Development Regulations, once CoreCivic stopped operating the Facility for 12 months, it lost its grandfathered status and, as a condition of reopening the Facility, had to obtain a special use permit from the City.

6.      In recognition of this fact, on February 21, 2025, CoreCivic applied for a special use permit so that it could use the Property as a detention center under a contract with the Department of Homeland Security's Immigration and Customs Enforcement agency ("ICE"). The City's Planning Commission set a public hearing on the application for April 7, 2025, with subsequent and final hearings to occur before the City Commission on May 13 and 27, 2025.

7.      But then on March 13, 2025, CoreCivic abruptly withdrew its application. It has now taken the position that it need not seek or obtain a special use permit and that it plans to start housing detainees at the Facility at some point in the immediate future, all in violation of the City's lawfully enacted ordinances. On March 25, 2025, CoreCivic stated that its recently awarded contract with ICE "necessitates a swift contract activation of the Midwest Regional Reception Center[1] to accommodate their pressing need for capacity in the region." According to CoreCivic, "ICE's pressing need for capacity dictates the speed at which we must move to hire and ready the facility (and thus does not allow time to go through a protracted permitting process)." In other words, CoreCivic refuses to comply with the City's permitting process because, it contends, it will take too long to do so. This is not a valid or legal rationale for violating City ordinances.

8.      This Court's swift intervention is imperative to prevent the irreparable harm to the City that will result if CoreCivic is allowed to flout the City's Development Regulations and

---

[1] CoreCivic is now referring to the Facility as the Midwest Regional Reception Center.

bypass the established processes for obtaining a special use permit to use its Property as a detention facility within the City.

## II.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, because the City and CoreCivic are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, in that the object of this suit for declaratory and injunctive relief, the Property, has a value of more than $75,000. The City is, for purposes of diversity of citizenship, a citizen of Kansas. CoreCivic is a Delaware corporation with its principal place of business in Tennessee and is thus a citizen of those two states.

10.    The Court has personal jurisdiction over CoreCivic because it has the requisite "minimum contacts" with Kansas under K.S.A. § 60-308, in that all causes of action alleged in this Complaint arose from the transaction of business in Kansas by CoreCivic, which owns and possesses the Property located within the state of Kansas.

11.    This Court is the appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions that gave rise to the causes of action alleged herein occurred, and the Property is situated in Leavenworth County, Kansas.

12.    This Court may enter a declaratory judgment under 28 U.S.C. § 2201 because an actual controversy exists due to CoreCivic's stated intention to use the Property as a jail or prison without first seeking a special use permit.

## III.    FACTS

### A.    For years, CoreCivic operates a "hell hole" within the City of Leavenworth.

13.    As noted at the outset of this Complaint, this Court succinctly described the Facility while it was operated by CoreCivic in 2021 as "an absolute hell hole."

14.     In April 2017, the United States Department of Justice's Office of Inspector General ("OIG") issued a 129-page audit report ("Audit Report") detailing the shortcomings and abuses that had occurred up to that point. A copy of the Audit Report is attached to this Complaint as Exhibit A and incorporated by reference.

15.     Understaffing was chief among the "issues affecting the safety and security" at the Facility. (Audit Report at ii.) This was "primarily driven by correctional officer vacancies, which reached as high as 23 percent" during the relevant time. (*Id.*) "These correctional officer vacancies led to several problems in 2015, including the [Facility's] long-term use of mandatory overtime, which [Facility] personnel said led to lower morale, security concerns, and fewer correctional officers available to escort medical staff and detainees to and from the health services unit." (*Id.*)

16.     According to the OIG, the shortage of correctional officers led to systemic closures of security posts that were *mandatory* to ensure the safe and secure operation of the Facility. (*Id.*) The correctional officers who hadn't yet quit were then shuffled around to fill the vacant posts, which snowballed into shortfalls in other services, including "assisting detainees with casework" and the "transitional services" that were critical for successfully reintegrating back into society. (*Id.*)

17.     CoreCivic then "took actions that exacerbated the problem." (*Id.*) Instead of transferring staff *from* other CoreCivic facilities to help, it transferred staff *to* other facilities. (*Id.* at ii-iii.) Bafflingly, it then added to its already disproportionate burden by agreeing to take on additional detainees from local non-federal prosecutions. (*Id.* at iii.)

18.     Other examples of mismanagement and malfeasance included active concealment of "triple bunking" to avoid demerits during audits, deficiencies in quality control mechanisms, and unlawful withholding of "sick account" funds that should have been paid to correctional

officers. (*Id.*) These are just some of the problems documented by the OIG in 2017. Yet despite all of these blatant and egregious failures, many of which involved lapses in *security*, the Facility's primary function, CoreCivic was paid in full. (*Id.*)

19.     Conditions only worsened after the OIG issued its audit report. According to the American Civil Liberties Union (ACLU) and the Federal Public Defenders (FPD) in the region, the total number of violent incidents was trending upward aggressively when the Facility finally closed. To highlight a few examples:

    a.     Beatings and stabbings, including of correctional officers, became so rampant due to insufficient patrolling that detainees and the lawyers who visited the Facility considered them routine.

    b.     Suicides were prevalent due to insufficient suicide-watch monitoring. Detainees were required to clean up the feces of the deceased.

    c.     Following the homicide of one detainee, the Facility went on lockdown for several weeks. Detainees were not allowed out of their cells except to shower every three-to-four days and were denied basic hygienic supplies and routine medical care.

    d.     Weapons were typically found stashed away following major incidents.

    e.     Sexual assault reports were discouraged and impeded by management.

    f.     Detainees were locked in showers as punishment.

    g.     Calls for help often went unanswered, leading detainees to arm themselves for their own protection.

    h.     Many cell doors *didn't even lock*, which forced detainees to create makeshift barricades for their own safety.

(ACLU and FPD Letter to the White House at 4-6, 8, attached to this Complaint as Exhibit B.)

20.     In the final years of the Property's use as a detention center, the Leavenworth Police Department ran into one roadblock after another when investigating violent crimes within the Facility. (Although mostly serving as a detention center for federal detainees under the charge of the U.S. Marshal for the District of Kansas, crimes occurring within the Facility had to be

investigated by the Leavenworth Police Department and prosecuted in the Leavenworth County District Court or City municipal court since the Facility was—and remains—privately owned.) CoreCivic seemed to have no plan concerning which law enforcement agency would handle a major crisis, such as a riot, hostage situation, or escape. Officers found it difficult to access the facility at all, and they were often required to conduct interviews from outside the Facility's gate.

21.     CoreCivic prohibited its employees who were victims of crimes from sitting for interviews with City police while they were on duty.  Instead, these crime victims were forced to provide an often incomplete written statement through the Facility's fence and then follow up on their own time. They often failed to follow up though, and both CoreCivic management and employees failed to assist the police with prosecutions, resulting in wasted time and effort by the City's police force. Officers were granted *no* access to other third-party witnesses to crimes, regardless of how critical their testimony may have been to a potential prosecution.

22.     CoreCivic failed repeatedly to report significant crimes that occurred on the Property until a significant time passed after they occurred, often several days and sometimes *months* later. In one instance in November 2018, CoreCivic failed to report a death of an inmate to City Police for six days. Crimes were often reported only because officers were already on scene dealing with another crime. CoreCivic staff refused to provide names of potential witnesses for several weeks at a time and routinely refused to turn over evidence, such as photographs and weapons that were used in assaults among inmates and against guards. (*Id.*)

23.     This also occurred multiple times with sexual assault allegations—CoreCivic staff would report the allegation, ostensibly to document the event for auditing purposes, and then refuse to cooperate with the City's investigation. Often when City police *were* called to the scene, CoreCivic staff had failed to secure the crime scene.  Detainees were allowed to walk through

7

uninhibited, and on several occasions, detainees and staff were instructed to clean up the crime scene before police even arrived, which of course destroyed all evidentiary value and any hope of successful prosecution. This included an inmate death by hanging. (*Id.*)

24.    The procedure for obtaining video evidence proved to be a moving target and changed depending on which corrections officers were on duty. Instead of cooperating with City police investigations and providing them courtesy copies of videos (as is standard in most jails), CoreCivic forced them to go through the more cumbersome, time-consuming, and unnecessary process of obtaining a formal subpoena to obtain video evidence.

25.    In addition to the unquantifiable harm caused by CoreCivic's mismanagement, its problems also extended tangibly and directly to the pocketbooks of City taxpayers. Multiple times, malfunctions with a grinder pump on the Property caused large pieces of debris (e.g., bedsheets, rags, etc.) to be released into the City's sewer system. This led to major downstream clogs in the City's main sewer lines and wastewater treatment facilities, expensive emergency maintenance calls to City employees at all hours of the day, and multiple mandatory reports to the Kansas Department of Health and the Environment as a result of the ensuing sewage spills.

26.    On August 13, 2019, the United States District Court for the District of Kansas issued a 188-page opinion which in part detailed the unlawfulness of CoreCivic's practice of recording attorney-client communications between detainees and their lawyers. *United States v. Carter*, Case No. 16-cr-20032-02-JAR, Doc. 758, pp. 166-76 (D. Kan. Aug. 13, 2019) (Robinson, J.). The fallout from this scandal led this Court to discharge certain detainees *outright* from custody into the community.

**B.    CoreCivic closes the Facility and stops using the Property for a detention center.**

27.    On January 26, 2021, President Biden ordered that "The Attorney General shall not renew Department of Justice contracts with privately operated criminal detention facilities, as consistent with applicable law." Executive Order 14006.

28.    Instead of choosing to house detainees from local governments as it had previously done or ICE detainees (which it could have done notwithstanding President Biden's executive order since CoreCivic would have been contracting with an agency other than the Department of Justice), CoreCivic opted to close the Facility effective January 1, 2022. No detainee has resided at the Facility since 2021. CoreCivic's website displayed the following message on March 19, 2025:

corecivic.com

 

☰ **MENU**

**More Info**

*This facility is currently inactive. To submit a notification of an allegation of sexual abuse made by individuals previously housed at this facility, please contact Heather Baltz, Sr. Director of PREA Programs and Compliance at Heather.Baltz@corecivic.com*

*Institutional employers seeking PREA background information on former employees of this facility should contact Margaret Houston in CoreCivic Human Resources at Margaret.Houston@corecivic.com*

(https://web.archive.org/web/20250319174656/https://www.corecivic.com/facilities/midwest-regional-reception-center)[2]

    29.    CoreCivic has now deleted the statement, "[t]his facility is currently inactive" from its website:

 

≡ MENU

**More Info**

*To submit a notification of an allegation of sexual abuse made by individuals previously housed at this facility, please contact Heather Baltz, Sr. Director of PREA Programs and Compliance at Heather.Baltz@corecivic.com*

*Institutional employers seeking PREA background information on former employees of this facility should contact Margaret Houston in CoreCivic Human Resources at Margaret.Houston@corecivic.com*

(https://www.corecivic.com/facilities/midwest-regional-reception-center.)

---

    [2] *See Marten Transp., Ltd. v. Plattform Advert., Inc.*, No. 14-2464-JWL, 2016 WL 1718862, at *4 (D. Kan. Apr. 29, 2016) (taking judicial notice of Wayback Machine records).

**C.    The City's Development Regulations require CoreCivic to apply for an SUP.**

30.    K.S.A. 12-741 *et seq.*, the Kansas Zoning Enabling Act, authorizes Kansas cities and counties to adopt "planning and zoning laws and regulations by cities and counties for the protection of the public health, safety and welfare."

31.    Pursuant to the Zoning Enabling Act, the City has adopted by ordinance its Development Regulations, a complete copy of which can be found at http://bit.ly/3E9GsGt. The City has attached as Exhibit C a copy of those portions of the Development Regulations cited in this Complaint.

32.    Appendix A to the Development Regulations is a Use Table that lists a host of possible land uses and specifies whether those uses are allowed within particular zoning districts in the City. If the letter "P" is in a cell of the Use Table, this means that the use specified in the left-hand column of the Use Table is allowed by right within the zoning district corresponding with that cell. If the letter "S" is in a cell of the Use Table, this means that the use specified in the left-hand column is allowed only "if reviewed and approved as a special use in accordance with Article II – Administration regarding Special Use Permits." If a cell is blank, this means the use is prohibited in the applicable zoning district. (Development Regulations, Ex. C , pg. A-1.)

33.    Under the Use Table, "Jails and Prisons" are allowed only in I-1 and I-2 zoning districts, and then only pursuant to an SUP issued by the City, because they are designated with an "S" in those two zoning districts. (*Id.* at pg. A-3.)

34.    Article 12 of the Development Regulations defines "Jails and Prisons" in relevant part to mean "Places in which people are physically confined and, usually, deprived of a range of personal freedoms." (*Id.* at pg. 12-21.)

35.    Section 2.04.A. of the Development Regulations provides as follows:

All uses identified in the zoning districts, use table or elsewhere in these regulations as a special use in any particular zoning district *shall require a special use permit*. Applications for special use permits may be submitted by the owners or agents of any property affected.

(*Id.* at pg. 2-9 (emphasis added).)

36.     The requirement that the owner of property to be used for a jail or prison obtain a special use permit was added to the City's Development Regulations through Ordinance No. 7911, which took effect on November 16, 2012 while CoreCivic was still using the Property as a detention center. (City of Leavenworth Ordinance No. 7911, attached hereto as Exhibit D.)

37.     Despite the adoption of Ordinance No. 7911, CoreCivic was not required to apply for an SUP while it was using the Property as a detention center because the Development Regulations had a "grandfather" provision, specifically Section 1.05.E.2:

*Status of existing legal uses designated as special uses*. Any existing legal use at the effective date of these development regulations which is designated as a special use by these development regulations shall be deemed as an existing special use and a lawful conforming use.

(Development Regulations, Ex. C at pg. 1-9, § 1.05.E.2.)

38.     As a result of the application of § 1.05.E.2, CoreCivic's use of the Property as a detention center was designated as a special use for which CoreCivic was not required to apply for or obtain a separate SUP while it used the Property for a detention center.

39.     However, once CoreCivic stopped using the Property for a detention center and discontinued using it as such for 12 months, the City Commission was authorized to rescind CoreCivic's designated special use of the Property in accordance with Section 2.04.C of the Development Regulations:

*Discontinuance or violation of permit conditions*. A special use permit may be granted by and continued annually by the city commission. The continuation of a special use permit exists with the property as long as such special use permit is used in accordance with its original intended and approved purpose and the annual SUP fee is paid. Any discontinuance of more than 12 months, violation of permit

conditions, or failure to pay a fee may enable the city commission to administratively rescind a special use permit.

(Development Regulations, Ex. C at pg. 2-11, § 2.04.C.)

40.    Even assuming CoreCivic did not have a special use "permit" because of its grandfathered status, it was nonetheless subject to the discontinuance provisions of § 2.04.C because § 2.04.C reflects the intention of the City, through its Development Regulations, not to allow property owners who have abandoned a use to take advantage indefinitely of special dispensations for the use of property. This is in keeping with the general principle that municipalities may provide for the gradual elimination of nonconforming uses. *See, e.g. Art Neon Co. v. City and Co. of Denver,* 488 F.2d 118, 121-22 (10th Cir. 1973); *Spurgeon v. Board of Comm'rs of Shawnee Co.*, 181 Kan. 1008, Syl. ¶ 2 (1957). Indeed, it would make no sense for § 2.04.C to apply only to special uses allowed pursuant to a City-issued permit, because Section 2.04 of the Development Regulations reflects the careful process the City must follow when deciding whether to issue a special use permit, including a balancing of the right of the property owner with the "economic development, welfare or convenience of the public" and the rights of neighboring property owners. The owner of property which has been grandfathered with a designated special use would have never accounted for these counterbalancing factors; discontinuing the special use of property for an extended period and then opting to resume that use justifies the City's requirement that the property owner account for the larger interests of the City and nearby residents if it wants to resume a use that requires an SUP.

41.    Accordingly, the City Commission adopted on March 25, 2025 a resolution rescinding the designated special use of the Property. A copy of that resolution is attached as Exhibit E and incorporated by reference.

42.    The policy of the City not to allow "nonconformances" in general to continue indefinitely is further reflected in § 1.05.D.8 of the Development Regulations, which addresses the abandonment of a grandfathered nonconforming use of property:

> *Abandonment or Discontinuance.* When a nonconforming use is abandoned for a period of 24 consecutive months any subsequent use or occupancy of such land after this period shall comply with the regulations of the zoning district in which such land is located.[3]

(Development Regulations, Ex. C at pg. 1-9, § 1.05.D.8.)

43.    So even if CoreCivic's use of the Property fell within the Development Regulations' definition of a nonconforming use, CoreCivic would have lost its right to use the Property in that manner because it stopped using it as a detention center for 24 consecutive months.

44.    The City Commission's resolution rescinding CoreCivic's special use designation for the Property also determined that CoreCivic could not use the Property for a jail or prison to the extent its prior use as such was a nonconforming use. (Resolution No. B-2394, Ex. E)

**D.    CoreCivic applies for and then withdraws its application for an SUP.**

45.    On February 21, 2025, CoreCivic applied for a special use permit for "reactivation" of the Facility as a "Detention Center." CoreCivic claimed in its SUP application that the Facility will house approximately 1,000 detainees at a time, who "will be held for approximately 51 days as they are processed through the immigration system," and that "[n]o ICE detainees will be released into the Leavenworth community." CoreCivic's application and supporting documentation are attached hereto as Exhibit F.

---

[3] Section 1.05.A.3 defines a "nonconforming use" as "An existing use which does not comply with the use regulations applicable to new uses in the zoning district in which it is located." (Development Regulations, Ex. C at pg. 1-7, § 1.05.A.3.) Section 1.05.D.1 generally grandfathers nonconforming uses of property within the City.

46.    CoreCivic's SUP application did not explain how it calculated the 51-day estimate that individual detainees would be held on average; no consideration for the countless ways in which detainees may be held for longer periods or ordered free to walk out its gates by a court;[4] no accountability for the potential strain on critical City services (such as sanitary sewer, fire protection, and police services); no measures to ensure cooperation with City police investigations of violent crimes; and no assurance that the Facility would be appropriately staffed so as to minimize the need for intervention by the City's police.

47.    The City intended to address all these concerns to the greatest extent possible under Kansas law through the process of reviewing and considering CoreCivic's application for an SUP.[5] Moreover, the City's Development Regulations mandate a public hearing on an SUP application before the City Planning Commission, in which "[a]ny interested person or party may appear and be heard at the hearing in person, by agent or by attorney."  (Development Regulations, Ex. C at pg. 2-10, § 2.04.B.4.) By refusing to participate in this lawfully mandated process, CoreCivic has deprived the citizens of Leavenworth of any opportunity to articulate other legitimate concerns

---

[4] Most habeas petitions seeking the release of detainees held at the Facility will be filed in the District of Kansas. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) ("[F]or core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement.") It stands to reason, therefore, that if this Court orders the release of a detainee from the Facility, the detainee could be released immediately into the City of Leavenworth. According to page 39 of the ICE National Detainee Handbook, https://bit.ly/3FPZAtG, if a released detainee cannot arrange for a friend or family member to pick them up, the detainee is to "ask staff at the facility or an ICE officer to arrange for your transportation to a public transportation location, such as a bus station, airport, or train." Greyhound has a bus stop in Leavenworth, https://bit.ly/3E3MFDZ, so it is entirely possible that, assuming an employee of CoreCivic or ICE abides by a detainee's request for transportation, CoreCivic or ICE could simply deposit released detainees at the Greyhound stop, at which point they would be on their own.

[5]    https://www.leavenworthks.org/ru/page/press-release-corecivic-special-use-permit-application.

over CoreCivic's use of the Property that the City could address through conditions placed on CoreCivic's SUP.

48.    The Development Regulations also provide for additional protections that will be nullified if CoreCivic is allowed to proceed without obtaining a special use permit. Specifically, adjacent landowners would be allowed to submit a petition protesting CoreCivic's application. If the requisite percentage of property owners signed such a petition, it would raise the threshold of votes needed to approve a permit from a simple majority to three-quarters of the City Commission. (*Id.* § 2.04.B.6.)[6]

49.    In determining whether to issue the permit, the City Commission would have been required to find that:

a.    The proposed special use complies with all applicable provisions of [the Development Regulations].

b.    The proposed special use at the specified location will contribute to and promote the economic development, welfare or convenience of the public.

c.    The special use will not cause substantial injury to the value of other property in the neighborhood in which it is to be located.

d.    The location and size of the special use, the nature and intensity of the operation involved in or conducted in connection with it, and the location of the site with respect to streets giving access to it are such that the special use will not dominate the immediate neighborhood so as to prevent development and use of neighboring property in accordance with the applicable zoning district regulations. In determining whether the special use will so dominate the immediate neighborhood, consideration shall be given to:

i.    The location, nature and height of buildings, structures, walls, and fences on the site, and

ii.    The nature and extent of landscaping and screening on the site.

---

[6] There are five members of the City Commission. So the submission of a valid protest petition would mean that CoreCivic's SUP would require four affirmative votes instead of three.

iii.  Off-street parking and loading areas whether on the premises or auxiliary to the premises will be provided in accordance with the standards set forth in this appendix and such areas adjoining residential uses will be located to protect such residential uses from any injurious effect.

iv.  Adequate utility, drainage, and other necessary facilities have been or will be provided.

v.  Adequate access roads or entrance and exit drives will be provided and shall be so designed to prevent traffic hazards and to minimize traffic congestion in public streets and alleys.

(*Id.* at pgs. 2-10 to 2-11, § 2.04.B.7.)

50.    In addition, Kansas law suggests that the City Commission may consider the so-called *Golden* factors in assessing an application for a special use permit. *See McPherson Landfill, Inc. v. Bd. of Co. Comm'rs of Shawnee Co.*, 274 Kan. 303, 306 (2002), citing *Golden v. City of Overland Park*, 224 Kan. 591 (1978). Those non-exclusive factors are: (a) the character of the neighborhood; (b) the zoning and uses of properties nearby; (c) the suitability of the subject property for the uses to which it has been restricted; (d) the extent to which removal of the restrictions will detrimentally affect nearby property; (e) the length of time the property has remained vacant as zoned; (f) the gain to the public health, safety, and welfare by the possible diminution of value of the developer's property as compared to the hardship imposed on the individual landowners; (h) the recommendations of a permanent or professional planning staff; and (i) the conformance of the requested change to the city's master or comprehensive plan. *Golden*, 224 Kan. at 598.

51.    In addition to the issues already discussed above regarding the problems with "[a]dequate utility, drainage, and other necessary facilities," the Facility is situated not on a rural outskirt, but in an industrially zoned district adjacent to single-family homes, and close to restaurants, grocery stores, and parks:



52.    Assuming the accuracy of CoreCivic's projection that the Facility would house 1,000 detainees, each for an average of 51 days, this would mean that the population of the facility would turn over completely about seven times per year, adding as many as 14,000 trips to the Property (1,000 x 7 x 2 trips in/out per detainee) annually via a single access road to the Property. This doesn't account for visitors, attorneys, or protestors, the latter of which must be assumed given the controversial nature of current immigration policies compounded by local antipathy toward CoreCivic because of the manner in which it managed the Facility previously.

53.    The City's Planning Commission set its public hearing on CoreCivic's application for April 7, 2025. The City Commission set subsequent and final hearings on CoreCivic's application for May 13 and 27, 2025.

54.    CoreCivic withdrew its SUP application on March 13, 2025, taking the position that it does not need a special use permit because obtaining one would take too long to comply

with ICE's demands. It has stated that its recently awarded contract with ICE "necessitates a swift contract activation of the Midwest Regional Reception Center to accommodate their pressing need for capacity in the region," and that "ICE's pressing need for capacity dictates the speed at which we must move to hire and ready the facility (and thus does not allow time to go through a protracted permitting process)."

55.    Unless CoreCivic is required to follow the City's requirements for obtaining a special use permit, neither the City nor its residents will have an opportunity to flesh out in any forum the conditions under which CoreCivic will be allowed to use the Property.

56.    Moreover, without a special use permit, the City Commission will be unable to enforce any conditions it would place on CoreCivic's use of the Property; under the Development Regulations, the City can revoke a special use permit if the City Commission finds, after notice and a public hearing, that the holder of the SUP "has violated any criteria of approval, changed circumstances supporting the approval or a determination that the use has become a nuisance by reason of design or operation of the use, site or buildings." (Development Regulations, Ex. C at pg. 2-11, § 2.04.D)

## COUNT I
### (Declaratory Judgment: Rescission of Designated Special Use)

57.    The City incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

58.    Section 2.04.A of the City's Development Regulations provides that "[a]ll uses identified in the . . . use table . . . as a special use in any particular zoning district shall require a special use permit."

59.    CoreCivic ceased using the Property for a detention center on or about January 1, 2022 and has not resumed using the Property as such at any point to date.

60.     The City Commission's Resolution No. B-2394 rescinded the special use designation afforded the Property under § 1.05.E.2 of the Development Regulations.

61.     CoreCivic is required to apply for and receive a special use permit from the City before using its Property for an ICE detention center, because CoreCivic intends to use the Property as a "jail" or "prison" as those terms are defined in the Development Regulations.

62.     CoreCivic has withdrawn its application for a special use permit and declared its intention to use the Property as a detention center without first obtaining from the City a special use permit.

63.     An actual controversy exists between the parties, in that the City contends that CoreCivic must have a special use permit before using the property to house detainees in a jail or prison, whereas CoreCivic contends that it does not need a special use permit to use the Property for that purpose.

WHEREFORE, the City prays that this Court enter judgment declaring that CoreCivic must apply for and obtain a special use permit in accordance with the procedures set forth in the City's Development Regulations prior to housing any detainees in the Facility; tax costs against CoreCivic; and grant any such further relief deemed just.

## COUNT II
### (Injunctive Relief)

64.     The City incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

65.     The City is substantially likely to succeed on the merits of this lawsuit because under the City's Development Regulations, CoreCivic is required to obtain a special use permit from the City before using the Property as a jail or prison.

66.    The City is likely to suffer irreparable, irreversible, direct, and intangible harms to the health, safety, comfort, economic development, and property values of Leavenworth citizens and businesses in the absence of preliminary and permanent injunctive relief for all the reasons discussed above. The City has a compelling interest in enforcing its ordinances and, without injunctive relief, it and its citizens will be deprived of the full, fair, and open public hearing needed to determine whether to place conditions on CoreCivic's use of the Property, and if so, what those conditions would be. Moreover, without a special use permit, CoreCivic will be able to use the Property free from any conditions the City would place on that use pursuant to a special use permit. Finally, without immediate injunctive relief enjoining use of the Property as a detention center pending a final judgment, the Court would be setting the stage for an otherwise unnecessary conflict between the City, the Court, and ICE once detainees are placed at the Facility; should the Court determine only after that point that CoreCivic is required to obtain a special use permit, the Court would have to account for the need to transfer those detainees and even risk the possibility that an order requiring CoreCivic to obtain a special use permit would be rendered ineffectual should ICE refuse to transfer them to another facility.

67.    These threatened harms to the City outweigh the harm any temporary restraining order, preliminary injunction, or permanent injunction may pose to CoreCivic. CoreCivic evidently entered into a contract with ICE either before or at the same time it was applying for a special use permit, reflecting knowledge on the part of CoreCivic that its right to use the Property for a detention center was not absolute. Thus, any harm that may befall CoreCivic through preliminary injunctive relief is self-induced.

68.    If issued, the preliminary and permanent injunctive relief sought will advance, not adversely affect, the public interest. The citizens of Leavenworth have an explicit interest in

ensuring that property uses within the City do not cause harm to public safety, health, or the environment; that interest is expressed through the Development Regulations.

69.     Immediate irreparable injury will result without the requested preliminary injunctive relief. Time is of the essence, in that CoreCivic has advised it must move so "swiftly" that it cannot wait for the City to conduct a hearing or otherwise process a special use permit application. Counsel for CoreCivic has advised that CoreCivic may begin moving detainees to the Facility in May, but the City has no assurance, depending on the demands made on CoreCivic by ICE, that CoreCivic will not move sooner.

WHEREFORE, the City prays that this Court enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting CoreCivic from housing any detainees in the Facility without applying for and obtaining a special use permit in accordance with the procedures set forth in the City's Development Regulations; tax costs against CoreCivic; and grant any such further relief deemed just.

SPENCER FANE LLP

/s/  David E. Waters_____

David E. Waters            KS #20773
Caleb P. Phillips          KS #26226
6201 College Boulevard, Suite 500
Overland Park, KS 66211
(913) 345-8100 (telephone)
(913) 345-0736 (fascimile)
dwaters@spencerfane.com
cphillips@spencerfane.com

W. Joseph Hatley          KS #12929
Angus W. Dwyer            KS #26995
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100 (telephone)
(816) 474-3216 (facsimile)
jhatley@spencerfane.com
adwyer@spencerfane.com

ATTORNEYS FOR PLAINTIFF
THE CITY OF LEAVENWORTH, KANSAS